CHRISTOPHER SOLLMAN

      Plaintiff

vs.

TOTAL RESTORATION SERVICES, LLC

      Defendant.

Case No:

## PLAINTIFF CHRISTOPHER SOLLMAN
## CIVIL COMPLAINT

## JURISDICTION

1. The jurisdiction of this Court is based upon the existence of a federal question and arises under the Americans with Disabilities Act at 42 U.S.C. §12101 *et seq.* ("ADA") and Title VII of the Civil rights Act of 1964, 42 U.S.C. §2000e *et seq*. ("Title VII"). As such, jurisdiction is conferred on this Court and Plaintiff is provided with the powers, remedies and procedures set forth in the ADA and Title VII, § 2000e-5(f)(3). Supplemental jurisdiction over the tort claims exists pursuant to 28 U.S.C. § 1367(a).

## **INTRADISTRICT ASSIGNMENT AND EXHAUSTION OF ADMINISTRATIVE REMEDIES**

2. Venue is proper in this District pursuant to Title VII, 42 U.S.C. § 2000e-5(f)(3), and the ADA because the unlawful acts and practices alleged herein occurred in the City of West Bend, County of Washington, in Wisconsin, which are situated in this judicial district.

1

3. At all material times, Plaintiff Christopher Sollman ("SOLLMAN"), was a resident of the State of Wisconsin, County of Washington. The employment relationship upon which he sues herein was made in and to be performed in the City of West Bend, County of Washington, State of Wisconsin. At all material times, SOLLMAN worked for DEFENDANT TOTAL RESTORATION SERVICES, LLC ("TRS" or "DEFENDANT") which was owned by Jason Stendhal ("J Stendahl") and Angela Stendahl ("A Stendahl") (together "Stendahls"). The address where SOLLMAN worked for Defendants was 253 Stockhausen Lane, West Bend, Washington County, Wisconsin, 53095. SOLLMAN is informed and believe, and on that basis alleges, that at all times the individuals referred to in this Complaint were and are owners, directors, officers, managers, and/or operators of the business known as TOTAL RESTORATION SEVICES ("TRS").

4. SOLLMAN is informed and believes and thereon allege that TRS is, and at all times herein mentioned, was, a corporation which was licensed to, and was doing, business in West Bend, Wisconsin. Defendant is an entity subject to suit under the Title VII 42 U.S.C. § 2000e-2000e-17 and the Americans with Disabilities Act 42 U.S.C. § 12101 *et seq.* as it is doing business in the State of Wisconsin.

5. TRS entered into an employment relationship with SOLLMAN beginning on or about approximately September 6, 2023. The injuries on which this action is based arise out of the aforementioned employment relationships.

6. On July 31, 2024, SOLLMAN filed administrative complaints of discrimination, harassment and retaliation based on his disabilities, failure to accommodate his disabilities and/or participate in the interactive process; discrimination based on religion, race and

2

gender/sex/sexual orientation with the Federal Equal Employment Opportunity Commission ("EEOC") as well as with the Wisconsin Department of Workforce Development, Equal Rights Division against TRS. The EEOC investigated SOLLMAN'S administrative complaint and found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge. TRS was invited to mediate the matter but chose not to and as such, SOLLMAN is filing the instant action. The EEOC administrative complaint resulted in companion complaints being filed with the Wisconsin Department of Workforce Development, Equal Rights Division which closed its investigations into SOLLMAN'S administrative complaints in June 2026.

7. The EEOC issued SOLLMAN a right-to-sue notice on April 8, 2026 which was received by SOLLMAN on or about April 8, 2026. The notice gave him 90 days in which to bring a federal action.

8. By filing the above administrative complaints, SOLLMAN has exhausted his administrative remedies and conferred the jurisdiction of this court.

9. On July 25, 2025, SOLLMAN filed a civil complaint for unpaid commissions and expenses, fraud and misrepresentation, infliction of emotional distress and related claims in the Washington County District Court, State of Wisconsin.

<strong>STATEMENT OF FACTS</strong>

10. DEFENDANT TRS is a construction company headquartered in West Bend, Wisconsin which focuses on roofing and roofing repairs in Wisconsin as well as in other states including but not limited to Illinois, Indiana and Florida. It is owned by J. Stendahl whose wife, Angela Stendahl ("A Stendahl") also worked for the company. While SOLLMAN was

3

employed by TRS, Joseph Ciardo ("Ciardo") was the General Manager and Mark Erd ("Erd") was the Sales Manager.

11. SOLLMAN was employed as a Project Manager for DEFENDANT from on or about September 6, 2023, until on or about June 8, 2024. His duties and responsibilities included selling roofing projects, whether repairs or new construction, to homeowners and businesses in Wisconsin, Indiana, and other states.

12. TRS, specifically Ciardo, recruited SOLLMAN for employment after seeing his resume on Indeed.com. in August 2023. At the time, SOLLMAN was employed by Boucher Cadillac in Waukesha, WI as a car salesman. Based on several misrepresentations about the terms and conditions of potential employment with TRS, including but not limited to potential earnings, working year-round, expense reimbursement and limited travel, SOLLMAN accepted the job offer and began working.

13. While he was employed, SOLLMAN sold approximately 25-26 roofing jobs for TRS in Wisconsin and other states. The contracts for roofing ranged anywhere from $5,476 to $102,944 each and totaled approximately $620,000 in total. SOLLMAN estimates the value of his commissions based upon these sales equal approximately $62,000. Yet, TRS only paid him $23,000 for his sales which payments were made sporadically over time including because TRS often changed the terms and conditions of how much and when he'd be paid his commissions, expense reimbursements and SPIFFS. TRS often changed the requirements he needed to complete for a project sold before being paid.

14. SOLLMAN also traveled extensively for his job both through-out Wisconsin and into other states, including Indiana often commuting long distances in a single day. He was not

4

reimbursed for his travel expenses or other job-related expenses such as when he purchased white pages and landglide applications to generate leads.

15. By the fall 2023, C SOLLMAN was significantly behind in paying his monthly bills including his mortgage. On or around this time SOLLMAN's utilities were shut off. This adversely affected SOLLMAN's mental health and was starting to negatively impact his marriage.

16. In November 2023, SOLLMAN and his wife, Kimberly Sollman ("K Sollman" or "Kimberly Sollman") (together "Sollmans") met with Erd as TRS' Sales Manager to review the processes and procedures for him to finalize his sales and commissions. Erd's procedures were different than what SOLLMAN had previously been trained to do. While SOLLMAN was paid a portion of his commissions earned, he was never them in full.

17. In December 2023, SOLLMAN and Kimberly Sollman met with Ciardo who again changed the processes and procedures SOLLMAN was to follow in order to finalize a sale and be paid his commissions. By January 2024, TRS did not pay SOLLMAN any commissions resulting in his being approximately $10,000 in arrears on his mortgage payments and utilities. SOLLMAN started manifesting symptoms of depression, notably lack of sleep. The non-payment also adversely affected K SOLLMAN's health as well as their marriage. Though he requested payment of the commissions he'd earned several times while he remained employed, they were not paid when earned.

18. In February 2024, TRS assigned C. SOLLMAN to work in Indiana on two different occasions. The first was for approximately 3 days and the second, for approximately one week. Not only did TRS reduce his commissions and fail to reimburse him for his travel expenses but TRS also provided SOLLMAN unsafe and unsanitary living accommodations. He

5

was forced to stay in a personal recreational vehicle ("RV") parked on the Stendahls' property. The RV lacked heat and plumbing and the propane tanks leaked dangerous carbon monoxide into the RV. One night, SOLLMAN was locked out of the RV and told to sleep in the home occupied by J Stendahl's father. SOLLMAN became violently ill from the adverse conditions including uncontrollable vomiting. When he returned to Wisconsin, SOLLMAN experienced a mental health crisis, including depressive episodes. Other non-Jewish, non-disabled employees were provided cleaner and warm housing accommodations.

19.   In March 2024, the SOLLMANS again met with Ciardo to resolve the nonpayment of commissions; however, again, TRS changed the processing procedures required of SOLLMAN prior to being paid.

20.   SOLLMAN has the following disabilities: Attention Deficit Hyperactivity Disorder ("ADHD") with depressed moods, complex PTSD, possible autism and ACOA (Adult Children of Alcoholics). Because of these, the continuing changes in processes and procedures were confusing to him. Ciardo recommended SOLLMAN work directly with J. Stendahl so he could train him; however, that never happened. Ciardo also asked K Sollman to quit her job so she could coach SOLLMAN; however, that was not viable. SOLLMAN and K Sollman together developed a list of reasonable accommodations for SOLLMAN on the job; however, TRS, including Ciardo and others, laughed at the requests and never implemented them.

21.   By April 2024, SOLLMAN had not been paid for several thousand dollars in earned commissions. Because of this, the Sollmans were unable to pay their monthly mortgage, car payment and other financial obligations. Falling behind on all utilities, the Sollmans' power, internet and phones were cut off. Their medical bills, including for their children, one of whom has autism, were threatened as were the therapy each child required. The Sollmans each suffered

6

from emotional distress, independently and as a married couple. Their marriage began to deteriorate even more. The Stendahls' solution was to give SOLLMAN unprescribed ADHD medication from Mexico which, because it didn't match his prescription, could have had severe physical side effects for C. SOLLMAN if he'd taken them. He didn't and instead threw them away.

22. In May 2024, after SOLLMAN asked how to get a roof tarped, Ciardo called him at home and yelled at him as loud as he could telling SOLLMAN he was "so fucking stupid", "why wouldn't he follow directions" and repeatedly asked him what the "fucking chain of command was".

23. After this conversation, K Sollman spoke with A. Stendahl telling her that (a) Ciardo's excessive yelling at her husband was unacceptable and had triggered his PTSD; (b) Ciardo's actions violated the ADA (which she knew because she works as a disability rights advocate); (c) the policies and procedures for sales had changed yet again which was incredibly difficult for SOLLMAN given his ADHD and had resulted in him not receiving a commission check for quite some time; and (d) requested a different work schedule for C. SOLLMAN. A. Stendahl agreed with Kimberly Sollman during the conversation; however, afterward nothing changed and again, SOLLMAN was never paid.

24. On June 6, 2024, SOLLMAN sent a text asking A. Stendahl to be reimbursed for fuel expenses he'd paid out himself, estimating he'd spent $6,800 on gas since he'd started his employment. He also asked her how he owed over $600 to TRS. A. Stendahl never responded and SOLLMAN was never reimbursed for his gas or related expenses.

25. On June 7, 2024, SOLLMAN again did not get paid and asked Ciardo why he hadn't been paid. He was told that his TRS commission account was a negative $695.

SOLLMAN asked why he allegedly owed any monies and Ciardo told him that he didn't know but that SOLLMAN himself should know. SOLLMAN told Ciardo that wasn't possible because he'd spent $6,800 on gas for which he hadn't been reimbursed. He also estimated that he was due at least $40,000 in unpaid commissions. DEFENDANT did not respond further.

26. On June 8, 2024, SOLLMAN received a text from one of his fellow sales employees, John Boyd ("JB"), telling SOLLMAN that he was taking his deals since he no longer worked at TRS. SOLLMAN wrote back that he didn't know that he'd been fired because he thought he had until Monday to decide whether or not he wanted to remain employed. A. Stendahl later wrote that it was …best if we go our separate ways…wish you the best…you were fired.

27. Shortly after SOLLMAN was terminated, he learned that TRS had modified the roofing contracts he'd solicited and finalized while employed by amounts equal to what he should have been paid in commissions. He learned this from a client who had reached out to him asking why he had a second contract which was lower than what he previously signed and that he had given a check to TRS that was higher than the contract price. The second contract still had SOLLMAN'S signature on it after he'd been terminated. By doing so, TRS fraudulently deprived SOLLMAN of his commissions.

28. SOLLMAN and his wife Kimberly Sollman suffered severe financial distress due to TRS' non-payment of commissions he earned and expenses he'd paid. He was unable to pay his loans and credit cards resulting in both Landmark Credit Union and Capitol One Bankcards filing suit against SOLLMAN for not paying his loans or credit balances. This resulted in the SOLLMANS also suffering severe emotional distress.

8

29. On or about July 31, 2024, C. SOLLMAN filed an administrative complaint for unpaid commissions and expenses with the State of Wisconsin, Department of Workforce Development. On or about September 18, 2024, C. SOLLMAN received notice that his claim was rejected because he was deemed to be a commissioned salesperson, not an employee under Chapter 109, Wisconsin's Wage Payments Claims and Collections law. The notice instructed C. SOLLMAN to seek resolution via the courts within two years of the date that the wages were payable to him, which he is now doing in the Washington County Circuit Court, Case No. 2025CV000427.

30. Since his wrongful termination, J. Stendhal has harassed the Sollmans and their family. For instance, on June 24, 2024, J Stendahl came to the Sollmans' home at approximately 8:21 p.m. and walked around the outside of the home calling SOLLMAN a retard, a f***ing homo, that he needed to learn how to read and yelling other profanities. The Sollmans' neighbor called the police, and J. Stendahl was arrested for disorderly conduct.

31. After his employment ended, SOLLMAN started working in sales for Benchmark Exteriors which did roofing, siding, and other related construction similar to the work performed by TRS. This job ended after the Stendahls followed SOLLMAN causing him to be concerned about his and his family's personal safety. Benchmark Exteriors was also concerned that the Stendahls would unlawfully interfere with their company's business.

32. In August 2024, gunshots were fired outside of SOLLMAN'S home and the Sollmans report it to the West Bend Police Department ("WBPD"). However, nothing was done.

33. After this, J Stendahl and TRS continued a series of intentional stalking and harassment against the Sollmans including excessively driving by or parking across from their

9

home, calling the West Bend Police Department "WBPD") on at least 10 different occasions and accusing SOLLMAN of somehow threatening them when in fact, he had not or by intentionally visiting him where he worked. In July 2024, the SOLLMANS filed for a restraining order, but it was denied.

34. Because of the Stendahls' continuing harassment of them, including via the WBPD, the Sollmans did not feel safe in their home. They withdrew their daughter from school, greatly reduced any outside activities, installed a home security system, stayed in a hotel on several occasions and eventually sold their home and moved.

35. SOLLMAN and his wife Kimberly as well as their children have suffered extreme emotional distress because of the Stendahls' actions towards them. They each have sought therapy to cope with the persistent fear and anxiety each has from the harassment endured. Starting in approximately October 2024, the stress exacerbated Kimberly Sollman's PMDD (Premenstrual Dysphoric Disorder) which is brought on by extreme and excessive stress. She was recently diagnosed with an adjustment disorder. Both SOLLMAN and his wife have difficulty sleeping, worry about the lack of money and ability to pay routine bills and even how they're going to afford to feed their family.

## FIRST CAUSE OF ACTION

**DISABILITY DISCRIMINATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITY ACT**
**AGAINST DEFENDANT TRS**

36. SOLLMAN repeats and re-alleges the allegations set forth in paragraphs 1 through 35, inclusive, of this Complaint.

37. The ADA makes it an "unlawful employment practice" for an employer to discharge a person on the basis of his disability. 42 U.S.C. § 12112(a). This includes when an

10

employer discharges an employee because of conduct which was caused by the disability.

38. While employed, SOLLMAN suffered from ADHD, adjustment disorder with depressed moods, complex TPSD, possible autism and ACOA. TRS knew of SOLLMAN'S disabilities including the Stendahls, Ciardo and Erd because during his first three days of employment, he told them. Shortly after his hire, SOLLMAN'S ADHD was openly discussed while visiting a client location between J. Stendahl, Ciardo and himself.

39. On another occasion, Erd was present when SOLLMAN comforted another employee, Andrew Galvin, who was having a medical issue by sharing with him that he had ADHD.

40. In October 2023, SOLLMAN was making several sales and Erd asked him to slow down and start following up with the clients. They discussed his ADHD in depth including how he'd become scattered at times and forget the follow-up work while focusing on the leads and sales themselves.

41. J. Stendahl, Erd and Ciardo also openly spoke about SOLLMAN'S disabilities, especially his ADHD, with other managers and co-workers including, for example, JB and Darrell. They joked about his disabilities and made condescending statements to the point where SOLLMAN became demoralized.

42. TRS never requested SOLLMAN provide any medical information confirming his disabilities.

43. On several occasions while he was employed, TRS changed the sales process and procedures which SOLLMAN needed to complete before he could be paid his commissions. These changes were difficult for him to track with his disabilities. Management would also simultaneously send him to different locations knowing he couldn't be in both

places or scheduled him on visits that were great distances apart. TRS managers created unrealistic expectations for SOLLMAN on the job, especially with his disabilities, resulting in him working extremely long days which meant completing paperwork late at night.

44. On almost a daily basis, SOLLMAN was called into the office, called on the phone and/or sent text messages in which management would yell at him for insubordination when he'd reach out to management to get an answer to a question. If one manager was not available, he'd continue going up the chain of command until someone could answer his questions. In response, managers, including J Stendhal, Ciardo and Erd, would call him and tell him how stupid he was or would call his wife Kimberly Sollman and tell her the same.

45. On November 14, 2023, SOLLMAN and Kimberly Sollman met with Erd wherein Kimberly explained SOLLMAN'S ADHD telling Erd that SOLLMAN needed to write things down and that Erd's procedures were different than those SOLLMAN had been trained on which created for him. Erd responded that SOLLMAN needed to do things his way.

46. On November 16, 2023, while on a trip to Green Bay, Ciardo offered his ADHD medication to SOLLMAN who did not accept it. SOLLMAN'S wife Kimberly, on other occasions witnessed Ciardo, pass out his ADHD medication to other employees. J. Stendahl also offered his medications to SOLLMAN, which again, SOLLMAN did not accept.

47. TRS also treated SOLLMAN adversely because of his disabilities, race and religion when it did not timely fix his truck which he needed for travel to make sales and when it provided him with a RV to stay in while working in Indiana which did not have any power, no running water and had trash everywhere. The two propane tanks running cause SOLLMAN to become sick, dizzy and disoriented that he was throwing up. Ciardo and another employee who was not disabled and not Jewish stayed in a comfortable, clean and operating RV. He was

12

also assigned customer leads that were not close to home but rather, required he travel sometimes quite a distance to meet with them whereas other non-disabled, non-Jewish employees were provided customers who were more local.

48. On at least three occasions, TRS called Kimberly Sollman complaining that SOLLMAN was not completing the orders and reviewed the processes and procedures for him to do so; however, each time those processes and procedures changed.

49. In December 2023, TRS asked SOLLMAN and Kimberly Sollman to meet with them and speak with Ciardo. Together they did meet with Ciardo who then reviewed the procedures to close a sale which differed from those Erd had explained earlier. The procedures did not make sense to Kimberly Sollman who told that to Ciardo they didn't. She also told him that if they didn't make sense to her that they would not make sense to SOLLMAN with his ADHD. Ciardo responded by saying "we all have ADHD" and then offered his medication to SOLLMAN which was not accepted.

50. After this, SOLLMAN and his wife set up a workspace for him at home where they'd review the work he did each day and complete the required paperwork. They developed a written schedule for SOLLOMAN to follow daily.

51. In March 2024, at his request, SOLLMAN and his wife Kimberly met with Ciardo to review his performance and also request accommodations for his ADHD. Prior to the meeting, they wrote out a list of ways to accommodate his disabilities when it came to client appointments, contracts etc. One request was that TRS allow SOLLMAN to arrive to work at 10:00 a.m. after his mediations had kicked in instead of at 8:00 a.m. SOLLMAN gave the list to Ciardo who crumpled it up, tossed it away and said it was "stupid". None of SOLLMAN'S requests for accommodations were granted.

13

52.     In March-April 2024, TRS created a new pay structure for sales employees which SOLLMAN did not understand requiring SOLLMAN and Kimberly Sollman again meet with Ciardo.  They discussed his ADHD again.  Ultimately, the new plan was not instituted because none of the sales employees liked it.

53.     On April 30, 2024, and then again in May 2024, Ciardo telephoned SOLLMAN and berated him repeatedly calling him various names such as fucking moron, stupid motherfucker, said "you're so fucking stupid" and called a bitch.

54.     On May 1, 2024, Ciardo asked SOLLMAN to commit insurance fraud which he refused to do.  Ciardo then became angry with SOLLMAN and told him how to commit the fraud. After SOLLMAN continued to refuse, Ciardo told him that TRS didn't give a rats fuck about him and they'd let him disintegrate and go away.

55.     On or about May 17, 2024, SOLLMAN spoke with A. Stendahl and informed her that Erd was having temper tantrums and yelling at him because of his disabilities and was condescending.  SOLLMAN explained to her that he had complex TPSD and that Erd's and Ciardo's yelling had triggered the resurgence of that disability.  SOLLMAN explained that he was terrified by their screaming and asked that he not work with Ciardo again.  A. Stendahl initially agreed with the request but after one week, TRS required SOLLMAN work with Ciardo again.

56.     Around this timeframe, Kimberly Sollman also communicated with A Stendahl via facebook messenger explaining that Ciardo had yelled at Chris and that Ciardo's yelling and swearing at SOLLMAN was unacceptable and violated his disability rights under law (which she knew because she works as a disability rights advocate).  Kimberly Sollman again asked if SOLLMAN could begin his day at 10:00 a.m. rather than at 8:00 a.m. and explained

14

that this would give SOLLMAN 2 hours for his medications to take effect. A. Stendahl told Kimberly Sollman that she'd honor the request but never did even after SOLLMAN himself brought in the proposed schedule and gave it to A. Stendahl.

57. On or about June 8, 2024, TRS discriminated against SOLLMAN when it terminated him without any warnings or counseling because of his disabilities and when it replaced him with an employee who on information and belief, did not have a disability or require reasonable accommodations on the job.

58. On June 24, 2024, J. Stendahl came to SOLLMAN'S home at approximately 8:21 p.m., walked around the house and loudly called SOLLMAN a retard, fucking homo and that he needed to learn how to read. J. Stendah was arrested; however, SOLLMAN and his family were so upset and fearful for their safety that they stayed elsewhere, not in their home, for three days. After this, TRS including J. Stendahl, continued to harass SOLLMAN and his family.

59. TRS engaged in a pattern and practice of discriminating against employees, including SOLLMAN, on the basis of their protected categories, including their disabilities, race, religion and sex in violation of the ADA by engaging in the course of conduct set forth above. For example, SOLLMAN witnessed management treat another employee who had Bipolar disorder treated adversely including by management talking down to him, talking negatively about him behind his back, withholding good leads from him and constantly telling him he'd fail. The employee became visibly become upset and hurt. They excluded him from meetings and ostracized him.

60. As a proximate result of TRS' conduct, SOLLMAN has suffered and will continue to suffer substantial losses incurred in earnings and other employment benefits he

15

would have received had TRS not taken such adverse employment action against him.

61. Further, and as a proximate result of TRS' conduct, SOLLMAN has suffered and will continue to suffer emotional distress damages including anxiety, severe depression, humiliation, much lowered self-esteem, sleeplessness, and other emotional distress and compensatory damages in an amount according to proof. SOLLMAN'S treatment by TRS and his sudden, wrongful and humiliating termination has also adversely affected his disabilities including but not limited to his depression and adjustment disorder.

62. TRS' actions, as set forth above, were motivated by animus towards SOLLMAN based on his disabilities and requests for reasonable accommodations while working. Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intention of injury SOLLMAN, and with an improper and evil motive amounting to malice. Said acts were carried out by managerial employees acting within the course and scope of their employment with TRS and with the intent to injure SOLLMAN. SOLLMAN is therefore entitled to recover compensatory and punitive damages commensurate with TRS'S wealth, size and as set forth under 42 USC 1981a, 42 USC §12117(a).

63. As a result of TRS' discriminatory acts as alleged herein, including violation of the ADA, SOLLMAN was damaged in an amount to be proven at trial, including, but not limited to, economic, compensatory, general and punitive damages, attorney fees and costs, according to proof.

WHEREFORE, SOLLMAN requests relief as hereinafter provided.

///

///

///

16

## SECOND CAUSE OF ACTION

## FAILURE TO REASONABLY ACCOMMODATE A DISABILITY AND PARTICIPATE IN THE INTER-ACTIVE PROCESS

## IN VIOLATION OF THE AMERICANS WITH DISABILITY ACT

## AGAINST DEFENDANT TRS

64.     SOLLMAN repeats and re-alleges the allegations set forth in paragraphs 1 through 63, inclusive, of this Complaint.

65.     At all times herein mentioned, the American with Disabilities Act 42 USC §12101 *et seq* was in full force and effect and binding on TRS.  The ADA requires TRS, as SOLLMAN'S employer, to reasonably accommodate his known mental disabilities.  An accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities.  The ADA also required TRS, as the employer, to engage in the inter-active process with SOLLMAN to determine what reasonable accommodations were needed by him and implement them accordingly.  The obligation to accommodate an employee's disability is a continuing duty that is not exhausted by one effort.  Within the time provided by law, SOLLMAN filed a complaint with the EEOC in full compliance this with section and received a right to sue letter.

66.     For purposes of the ADA, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination.  The link between an employee's disability and his termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability.

67.     At all times, TRS knew of SOLLMAN'S disabilities of which it was informed

17

shortly after his employment started.  This included SOLLMAN'S direct managers Erd and Ciardo as well as both J. Stendahl and A. Stendahl.

68.     On several occasions, SOLLMAN objected to the travel requirements given to him by TRS including because the long days meant that the sales paperwork was delayed. SOLLMAN and his wife Kimberly Sollman met with Erd, Ciardo and/or A Stendahl to discuss reasonable accommodations for him including but not limited to letting him begin his work day at 10:00 a.m. instead of at 8:00 a.m. so that his medications would kick in.  Ciardo responded by laughing and throwing out the request.  A. Stendahl initially agreed but then reneged on the approval and the schedule was not implemented.

69.     SOLLMAN also believes that TRS treated him adversely because of his disabilities when it intentionally did not timely fix his vehicle needed to travel for sales yet it fixed the vehicles for other non-disabled sales employees.  TRS also provided other non-disabled employees with healthy and safe lodging accommodations in Indiana where it did not do the same for him.

70.     SOLLMAN also objected whenever the procedures were changed to finalize the sale of a roofing contract.  Despite the objections, the procedures were changed on at least three different occasions requiring that SOLLMAN relearn them.  No-one at TRS sat down with SOLLMAN to discuss other accommodations other than to request his wife, Kimberly, quit her job to assist him which was not feasible given the household required two incomes.  Further, though SOLLMAN was not paid his commissions, on in formation and belief, other employees who did not have disabilities were paid the commissions due to them based on their sales.

71.     Though SOLLMAN and his wife set up a separate workplace for him at home where he could complete the paperwork at the end of each day, TRS still complained about

18

SOLLMAN'S performance, would repeatedly call him stupid and otherwise berate him.

72.     Despite the fact that TRS did not fully accommodate SOLLMAN'S disabilities and did not fully engage in the inter-active process of determining any accommodations, SOLLMAN could and did perform the essential functions of his position by producing good sales numbers for the company.

73.     As a proximate result of TRS' conduct, SOLLMAN has suffered and will continue to suffer substantial losses incurred in earnings and other employment benefits he would have received had TRS not taken such adverse employment action against him.

74.     Further, and as a proximate result of TRS' conduct, SOLLMAN has suffered and will continue to suffer emotional distress damages including anxiety, severe depression, humiliation, much lowered self-esteem, sleeplessness, and other emotional distress and compensatory damages in an amount according to proof.  SOLLMAN'S treatment by TRS and his sudden, wrongful and humiliating termination has also adversely affected his disabilities including but not limited to his depression and adjustment disorder.

75.     TRS' actions, as set forth above, were motivated by animus towards SOLLMAN based on his disabilities and requests for reasonable accommodations while working.  Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intention of injury SOLLMAN, and with an improper and evil motive amounting to malice.  Said acts were carried out by managerial employees acting within the course and scope of their employment with TRS and with the intent to injure SOLLMAN.  SOLLMAN is therefore entitled to recover compensatory and punitive damages commensurate with TRS'S wealth, size and as set forth under 42 USC §1981a, 42 USC §12117(a).

76.     As a result of TRS'S failure to reasonably accommodate SOLLMAN'S

19

disabilities as alleged herein and which violated the ADA, SOLLMAN was damaged in an amount to be proven at trial, including, but not limited to, economic, compensatory, general and punitive damages, attorney fees and costs, according to proof.

WHEREFORE, SOLLMAN requests relief as hereinafter provided.

## THIRD CAUSE OF ACTION
## HARASSMENT BASED ON DISABILITIES
## IN VIOLATION OF THE AMERICANS WITH DISABILITY ACT
## AGAINST DEFENDANT TRS

77. SOLLMAN repeats and re-alleges the allegations set forth in paragraphs 1 through 76, inclusive, of this Complaint.

78. At all times herein mentioned, the American with Disabilities Act 42 USC §12101 *et seq* was in full force and effect and binding on TRS. The ADA requires TRS, as SOLLMAN'S employer, not only reasonably accommodate his known mental disabilities but also not harass him because of those disabilities.

79. At all times, TRS knew of SOLLMAN'S disabilities because he told his managers about his disabilities within days of his employment commencing and on multiple occasions thereafter. This included SOLLMAN'S direct managers Erd and Ciardo as well as both J. Stendahl and A. Stendahl. The ADA prohibits harassment of an employee because of his disabilities. (42 U.S.C. §12112(a))

80. On several occasions, SOLLMAN objected to the travel requirements given to him by TRS including because the long days meant that the sales paperwork was delayed. SOLLMAN and his wife Kimberly met with or spoke with Erd, Ciardo and/or A Stendahl to discuss reasonable accommodations for him including but not limited to letting him begin his work day at 10:00 a.m. instead of at 8:00 a.m. so that his medications would kick in. Ciardo

20

responded by laughing and throwing out the request. A. Stendahl initially agreed but then reneged on the approval and the schedule was not implemented.

81. J. Stendahl, Erd and Ciardo also openly spoke about SOLLMAN'S ADHD with other managers and co-workers including for example, JB and Darrell. They joked about his disabilities and made condescending statements to the point where SOLLMAN became demoralized.

82. On almost a daily basis, SOLLMAN was called into the office, called on the phone and/or sent text messages in which management would yell at him for insubordination when he'd reach out to management to get an answer to a question. If one manager was not available, he'd continue going up the chain of command until someone could answer his questions. In response, managers, including J Stendhal, Ciardo and Erd, would call him and tell him how stupid he was or would call his wife Kimberly Sollman and tell her the same which she would share with them. When the calls were made, the managers would yell and scream at either SOLLMAN or Kimberly when they were saying how stupid he was.

83. In December 2023, TRS asked SOLLMAN and Kimberly Sollman to meet with them and speak with Ciardo. Together they did meet with Ciardo who then reviewed the procedures to close a sale which differed from those Erd had explained earlier. The procedures did not make sense to Kimberly Sollman who told that to Ciardo. She also told him that if they didn't make sense to her that they would not make sense to SOLLMAN with his ADHD. Ciardo responded by saying "we all have ADHD" and then offered his medication to SOLLMAN which was not accepted. On another occasion, J. Stendahl offered his medications to SOLLMAN.

84. In early February 2024, SOLLMAN and two others were sent to Indiana on a

21

job.  When they arrived, the other two employees, Ciardo and Darrell Jackson, who were not disabled, were provided a clean and heated trailer while SOLLMAN was required to sleep in a cold, dirty and nonfunctioning trailer.  SOLLMAN became quite ill.  Ciardo told him that he didn't die so he was fine.

85.    In March 2024, at his request, SOLLMAN and Kimberly Sollman met with Ciardo to review his performance and also request accommodations for his ADHD.  Prior to the meeting, they wrote out a list of ways to accommodate his disabilities when it came to client appointments, contracts etc.  One request was that TRS allow SOLLMAN to arrive to work at 10:00 a.m. after his mediations had kicked in for the day instead of starting at 8:00 a.m.  SOLLMAN gave the list to Ciardo who crumpled it up, tossed it away and said it was "stupid".  None of SOLLMAN'S requests for accommodations were granted.

86.    In May 2024, after SOLLMAN asked how to get a roof tarped, Ciardo called him at home and yelled at him as loud as he could telling SOLLMAN he was "so fucking stupid", "why wouldn't he follow directions" and repeatedly asked him what the "fucking chain of command was".

87.    After this conversation, Kimberly Sollman spoke with A. Stendahl telling her that (a) Ciardo's excessive yelling at her husband was unacceptable and had triggered his PTSD; (b) TRS' treatment of SOLLMAN violated disability laws and regulations; (c)  the policies and procedures for sales had changed yet again which was incredibly difficult for  SOLLMAN given his ADHD and had resulted in him not receiving a commission check for quite some time; and (d) she requested a different work schedule for SOLLMAN.  A. Stendahl agreed with Kimberly Sollman during the conversation; however, afterward nothing changed and the harassment continued.

22

88.     Despite the fact that TRS harassed SOLLMAN because of his disabilities, SOLLMAN could and did perform the essential functions of his position by producing good sales numbers for the company.

89.     As a proximate result of TRS' conduct, SOLLMAN has suffered and will continue to suffer substantial losses incurred in earnings and other employment benefits he would have received had TRS not taken such adverse employment action against him.

90.     Further, and as a proximate result of TRS' conduct, SOLLMAN has suffered and will continue to suffer emotional distress damages including anxiety, severe depression, humiliation, much lowered self-esteem, sleeplessness, and other emotional distress and compensatory damages in an amount according to proof.  SOLLMAN'S treatment by TRS and his sudden, wrongful and humiliating termination has also adversely affected his disabilities including but not limited to his depression and adjustment disorder.

91.     TRS' actions, as set forth above, were motivated by animus towards SOLLMAN based on his disabilities and requests for reasonable accommodations while on the job.  Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intention of injury SOLLMAN, and with an improper and evil motive amounting to malice.  Said acts were carried out by managerial employees acting within the course and scope of their employment with TRS and with the intent to injure SOLLMAN.  SOLLMAN is therefore entitled to recover compensatory and punitive damages commensurate with TRS'S wealth, size and as set forth under 42 USC §1981a, 42 USC §12117(a).

92.     As a result of TRS' harassment of SOLLMAN because of his disabilities and which violated the ADA, SOLLMAN was damaged in an amount to be proven at trial, including, but not limited to, economic, compensatory, general and punitive damages, attorney

23

fees and costs, according to proof.

WHEREFORE, SOLLMAN requests relief as hereinafter provided.

## <u>FOURTH CAUSE OF ACTION</u>

## **RETALIATION AFTER REQUESTING REASONABLE ACCOMMODATIONS**

## **IN VIOLATION OF THE AMERICANS WITH DISABILITY ACT**

## **AGAINST DEFENDANT TRS**

93.     SOLLMAN repeats and re-alleges the allegations set forth in paragraphs 1 through 92, inclusive, of this Complaint.

94.     The ADA makes it an "unlawful employment practice" for an employer to discharge a person after the employee requests reasonable accommodations on the job.  42 U.S.C. § 121203.  An employer discharges an employee because of his disability when it fires the employee for conduct, which was caused by the disability. It is also unlawful for an employer to retaliate against an employee who requests reasonable accommodations for their disability.

95.     While employed, SOLLMAN suffered from ADHD, adjustment disorder with depressed moods, complex TPSD, possible autism and ACOA.  TRS knew of SOLLMAN'S disabilities which were known by management including the Stendahls, Ciardo and Erd because during his first three days he told them.  After this, his disabilities were openly discussed with managers at TRS including with other employees.

96.     On November 14, 2023, SOLLMAN and Kimberly met with Erd wherein Kimberly explained SOLLMAN'S ADHD telling him that SOLLMAN needed to write things down but that Erd's procedures were different than how SOLLMAN had been trained which created difficulties for him.  Erd responded that SOLLMAN needed to do things his way.

97.     On November 16, 2023, while on a trip to Green Bay, Ciardo offered his ADHD

medication to SOLLMAN who did not accept it. SOLLMAN'S wife Kimberly, on other occasions witnessed Ciardo pass out his ADHD medication to other employees. J. Stendahl also offered his medications to SOLLMAN which again, SOLLMAN did not accept.

98. In December 2023, TRS asked SOLLMAN and Kimberly Sollman to meet with them and speak with Ciardo. Together they did meet with Ciardo who then reviewed the procedures to close a sale which differed from those Erd had explained earlier. The procedures did not make sense to Kimberly Sollman who told that to Ciardo and also told him that if they didn't make sense to her that they would not make sense to SOLLMAN with his ADHD. Ciardo responded by saying "we all have ADHD" and then offered his medication to SOLLMAN which was not accepted. On another occasion, J. Stendahl offered his medications to SOLLMAN.

99. In March 2024, at his request, SOLLMAN and his wife Kimberly met with Ciardo to review his performance and also request accommodations for his ADHD. Prior to the meeting, they wrote out a list of ways to accommodate his disabilities when it came to client appointments, contracts etc. One request was that TRS allow SOLLMAN to arrive to work at 10:00 a.m. after his mediations had kicked in for the same instead of at 8:00 a.m. SOLLMAN gave the list to Ciardo who crumpled it up, tossed it away and said it was "stupid". None of SOLLMAN'S requests for accommodations were granted.

100. In a subsequent meeting in March-April 2024, after TRS created a new pay structure for sales employees which SOLLMAN did not understand, SOLLMAN and Kimberly Sollman again met with Ciardo and discussed his disabilities.

101. On or about May 17, 2024, SOLLMAN spoke with A. Stendahl and informed her that Erd was having temper tantrums and yelling at him because of his disabilities and was

25

condescending. SOLLMAN told her about the time Ciardo yelled at him and explained he had complex TPSD and that Erd's and Ciardo's yelling had triggered that disabilities resurgence. SOLLMAN explained that he was terrified by their screaming and asked that he not work with Ciardo again. A. Stendahl agreed with the request but after one week, TRS required SOLLMAN work with Ciardo again.

102. Around this timeframe, Kimberly Sollman also communicated with A Stendahl via facebook messenger explaining that Ciardo had yelled at Chris and that Ciardo's yelling and swearing at SOLLMAN was unacceptable and violated his disability rights. She again asked if SOLLMAN could begin his day at 10:00 a.m. rather than at 8:00 a.m. and explained that this would give SOLLMAN 2 hours for his medications to take effect. A. Stendahl told Kimberly Sollman that she'd honor the request but never did even after SOLLMAN himself brought in the proposed schedule and gave it to A. Stendahl.

103. On or about June 8, 2024, TRS retaliated against SOLLMAN when it terminated him without any warnings or counseling because of his disabilities and requests for reasonable accommodations.

104. On June 24, 2024, J. Stendahl came to SOLLMAN'S home at approximately 8:21 p.m., walked around the house and called him a retard, fucking home and that he needed to learn how to read. J. Stendah was arrested; however, SOLLMAN and his family were so upset and were in fear for their safety, they stayed away from their home for three days. After this, TRS including J. Stendahl harassed SOLLMAN and his family.

105. TRS engaged in a pattern and practice of retaliating against employees, including SOLLMAN, on the basis of their protected categories, including their disabilities, in violation of the ADA by engaging in the course of conduct set forth above. For example,

26

SOLLMAN witnessed another employee who had Bipolar disorder treated adversely including management would talk down to him. They also talked negatively about him behind his back, withheld good leads from him and constantly said he'd fail. They said derogatory and mean things to him to the point where he'd be visibly become upset and hurt. They excluded him from meetings and ostracized him.

106. As a proximate result of TRS' conduct, SOLLMAN has suffered and will continue to suffer substantial losses incurred in earnings and other employment benefits he would have received had TRS not taken such adverse employment action against him.

107. Further, and as a proximate result of TRS' conduct, SOLLMAN has suffered and will continue to suffer emotional distress damages including anxiety, severe depression, humiliation, much lowered self-esteem, sleeplessness, and other emotional distress and compensatory damages in an amount according to proof. SOLLMAN'S treatment by TRS and his sudden, wrongful and humiliating termination has also adversely affected his disabilities including but not limited to his depression and adjustment disorder.

108. TRS' actions, as set forth above, were motivated by animus towards SOLLMAN based on his disabilities and requests for reasonable accommodations while working. Said acts were committed maliciously, fraudulently and oppressively, with the wrongful intention of injury SOLLMAN, and with an improper and evil motive amounting to malice. Said acts were carried out by managerial employees acting within the course and scope of their employment with TRS and with the intent to injure SOLLMAN. SOLLMAN is therefore entitled to recover compensatory and punitive damages commensurate with TRS'S wealth, size and as set forth under 42 USC §1981a, 42 USC §12117(a).

109. As a result of TRS' retaliation of SOLLMAN because of his disabilities and

27

which violated the ADA, SOLLMAN was damaged in an amount to be proven at trial, including, but not limited to, economic, compensatory, general and punitive damages, attorney fees and costs, according to proof.

WHEREFORE, SOLLMAN requests relief as hereinafter provided.

## FIFTH CAUSE OF ACTION

## DISCRIMINATION BASED ON RACE

## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, as appended 42 U.S.C. §2000E-2000E-17

## AGAINST DEFENDANT TRS

110. SOLLMAN repeats and re-alleges the allegations set forth in paragraphs 1 through 109, inclusive, of this Complaint.

111. Title VII protects employees on the basis of their race and religion from discrimination, harassment and retaliation in the workplace.

112. During the first three days of his employment, SOLLMAN informed Ciardo that he was Jewish. Thereafter, Ciardo regularly made jokes about Jewish people especially in front of SOLLMAN. For example, he joked about how copper wire was invented – two Jews were fighting over a penny. SOLLMAN never responded because he needed to keep his job. Other employees told similar jokes about Jewish people over time.

113. On a daily basis, management would send out Teams group messages and group text messages that included Bible verses about God. They would say "amen" at the end of meeting.

114. In late 2023, SOLLMAN and his wife Kimberly attended the company Christmas party during which, several jokes were told about Christ being Jewish AND ABOUT Jewish people not celebrating Christmas. They were the only two Jewish employees in

28

attendance.

115. One of the manuals given to sales employees was titled the "Training Bible".

116. While working in Indiana, non-Jewish employees were provided a clean and safe place to stay while SOLLMAN, who was Jewish, was not and became violently ill because of the filth, lack of heat and other adverse conditions.

117. Non-Jewish employees were also paid more regularly than was SOLLMAN including their commissions and reimbursement for expenses. On information and belief, they were also provided better client leads and were not required to travel as far a distance as he was to meet with potential clients.

118. As a result of TRS' discriminatory acts as alleged herein, including violation of Title VII when it discriminated against and terminated SOLLMAN because of his race and religion, SOLLMAN has suffered and continues to suffer substantial losses in earnings and other employment benefits he would have received had TRS not wrongfully terminated his employment. This includes lost wages and benefits to-date as well as front pay under Title VII.

119. SOLLMAN is also entitled to general damages given he's suffered and continues to suffer emotional distress all to his damage in an amount according to proof. Indeed, SOLLMAN was humiliated while employed with TRS and for months thereafter including because of his Jewish heritage. SOLLMAN, as a proximate result of TRS' conduct, has suffered and will continue to suffer emotional distress damages including anxiety, severe depression, humiliation, much lowered self-esteem, sleeplessness, and other emotional distress and compensatory damages in an amount according to proof. SOLLMAN'S treatment by TRS and his sudden, wrongful and humiliating termination has also adversely affected his disabilities including but not limited to his depression and adjustment disorder.

120.     TRS, and each of them, did the acts alleged herein maliciously, fraudulently, willfully and oppressively, with the wrongful intent to injure SOLLMAN, and from an improper and evil motive amounting to malice.  The acts of allowing SOLLMAN to be harassed,  discriminated and retaliated against by his superiors and others then terminating his employment.  SOLLMAN is therefore entitled to punitive damages commensurate with TRS'S wealth and as provided for under Title VII.

121.     As a result of Defendant TRS'S discriminatory acts as alleged herein, including violation of Title VII, SOLLMAN was damaged in an amount to be proven at trial, including, but not limited to, compensatory, general and punitive damages, attorneys' fees and costs, according to proof and as provided by 42 U.S.C. § 1981(a)(2).

WHEREFORE, SOLLMAN requests relief as hereinafter provided.

## SIXTH CAUSE OF ACTION

### DISCRIMINATION BASED ON RELIGION

### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, as appended 42 U.S.C. §2000E-2000E-17

### AGAINST DEFENDANT TRS

122.     SOLLMAN repeats and re-alleges the allegations set forth in paragraphs 1 through 121, inclusive, of this Complaint.

123.     Title VII protects employees on the basis of their race and religion from discrimination, harassment and retaliation in the workplace.

124.     During the first three days of his employment, SOLLMAN informed Ciardo that he was Jewish.  Thereafter, Ciardo regularly made jokes about Jewish people especially in front of SOLLMAN.  For example, he joked about how copper wire was invented – two Jews were

fighting over a penny.  SOLLMAN never responded because he needed to keep his job. Other employees told similar jokes about Jewish people over time.

125.    On a daily basis, management would send out Teams group messages and group text messages that included Bible verses about God.  They would say "amen" at the end of meeting.

126.    In late 2023, SOLLMAN and his wife Kimberly attended the company Christmas party during which, several jokes were told about Christ being Jewish AND ABOUT Jewish people not celebrating Christmas.  They were the only two Jewish employees in attendance.

127.    One of the manuals given to sales employees was titled the "Training Bible".

128.    While working in Indiana, non-Jewish employees were provided a clean and safe place to stay while SOLLMAN, who was Jewish, was not and became violently ill because of the filth, lack of heat and other adverse conditions.

129.    Non-Jewish employees were also paid more regularly than was SOLLMAN including their commissions and reimbursement for expenses.  On information and belief, they were also provided better client leads and were not required to travel as far a distance as he was to meet with potential clients.

130.    As a result of TRS' discriminatory acts as alleged herein, including violation of Title VII when it discriminated against and terminated SOLLMAN because of his race and religion, SOLLMAN has suffered and continues to suffer substantial losses in earnings and other employment benefits he would have received had TRS not wrongfully terminated his employment.  This includes lost wages and benefits to-date as well as front pay under Title VII.

131.    SOLLMAN is also entitled to general damages given he's suffered and

31

continues to suffer emotional distress all to his damage in an amount according to proof. Indeed, SOLLMAN was humiliated while employed with TRS and for months thereafter including because of his Jewish heritage.  SOLLMAN, as a proximate result of TRS' conduct, has suffered and will continue to suffer emotional distress damages including anxiety, severe depression, humiliation, much lowered self-esteem, sleeplessness, and other emotional distress and compensatory damages in an amount according to proof.  SOLLMAN'S treatment by TRS and his sudden, wrongful and humiliating termination has also adversely affected his disabilities including but not limited to his depression and adjustment disorder.

132.    TRS, and each of them, did the acts alleged herein maliciously, fraudulently, willfully and oppressively, with the wrongful intent to injure SOLLMAN, and from an improper and evil motive amounting to malice.  The acts of allowing SOLLMAN to be harassed,  discriminated and retaliated against by his superiors and others then terminating his employment.  SOLLMAN is therefore entitled to punitive damages commensurate with TRS'S wealth and as provided for under Title VII.

133.    As a result of Defendant TRS'S discriminatory acts as alleged herein, including violation of Title VII, SOLLMAN was damaged in an amount to be proven at trial, including, but not limited to, compensatory, general and punitive damages, attorneys' fees and costs, according to proof and as provided by 42 U.S.C. § 1981(a)(2).

WHEREFORE, SOLLMAN requests relief as hereinafter provided.

///
///
///

32

**REVERSE GENDER DISCRIMINATION**

**In Violation of Title VII**
**42 U.S.C. §§ 2000e et seq.**

**AGAINST DEFENDANT TRS**

134. SOLLMAN repeats and re-alleges the allegations set forth in paragraphs 1 through 133, inclusive, of this Complaint.

135. SOLLMAN was at all times material hereto an employee, as defined with 42 U.S.C. § 2000e(f) under Title VII which prohibits discrimination, harassment and retaliation in employment based on one's sex/gender.

136. Defendant TRS is and was at all times material hereto an employer within the meaning of 42 U.S.C § 2000e(b). As such, Defendant TRS is barred from discriminating in any term, condition or privilege of employment including on the basis of an employee's sex/gender and from retaliating against an employee on the same basis.

137. Defendant TRS reversely discriminated against SOLLMAN on the basis of his sex in violation of 42b U.S.C. § 2000e et seq. when, Defendant TRS on more than one occasion yelled profanities at SOLLMAN calling him a fucking homo. TRS, including the Stendahls, Erd and Ciardo, knew that SOLLMAN was married and heterosexual.

138. On information and belief, TRS did not yell profanities at other non-disabled, non-Jewish employees including by calling them a fucking homo.

139. Thus, TRS discriminated against SOLLMAN in a reverse manner based on his sex/gender.

140. On information and belief, TRS has engaged in a pattern and practice of discriminating against and harassing employees, including SOLLMAN, on the basis of their protected categories, including reversely based on their sex/gender, in violation of Title VII by engaging in the course of conduct set forth above.

141. As a proximate result of TRS' conduct, SOLLMAN have suffered, and will continue to suffer, substantial losses incurred in earnings and other employment benefits he would have received had Defendant TRS not taken such adverse employment action against him.

142. SOLLMAN is also entitled to general damages given he's suffered and continues to suffer emotional distress all to his damage in an amount according to proof. Indeed, SOLLMAN was humiliated while employed with TRS and for months thereafter including because of his Jewish heritage. SOLLMAN, as a proximate result of TRS' conduct, has suffered and will continue to suffer emotional distress damages including anxiety, severe depression, humiliation, much lowered self-esteem, sleeplessness, and other emotional distress and compensatory damages in an amount according to proof. SOLLMAN'S treatment by TRS and his sudden, wrongful and humiliating termination has also adversely affected his disabilities including but not limited to his depression and adjustment disorder.

143. TRS, and each of them, did the acts alleged herein maliciously, fraudulently, willfully and oppressively, with the wrongful intent to injure SOLLMAN, and from an improper and evil motive amounting to malice. The acts of allowing SOLLMAN to be harassed, discriminated and retaliated against by his superiors and others then terminating his employment. SOLLMAN is therefore entitled to punitive damages commensurate with TRS'S wealth and as provided for under Title VII.

144. As a result of Defendant TRS'S discriminatory acts as alleged herein, including violation of Title VII, SOLLMAN was damaged in an amount to be proven at trial, including, but not limited to, compensatory, general and punitive damages, attorneys' fees and costs, according to proof and as provided by 42 U.S.C. § 1981(a)(2).

WHEREFORE, SOLLMAN requests relief as hereinafter provided.

### **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment against defendants as follows:

1. For all actual, consequential, and incidental losses, including, but not limited to

34

the loss of income and benefits, including back pay and front pay, according to proof, together with prejudgment for all causes of action;

2.      For general, compensatory and non-economic damages for all causes of action;

3.      For exemplary and punitive damages for all causes of action;

4.      For costs of suit herein, including reasonable attorneys' fees;

5.      For prejudgment interest at the prevailing legal rate; and

6.      For such other and further relief as the Court may deem proper.


DATED:  July 6, 2026          THE HUBER LAW FIRM



By:   _____

BETH A. HUBER
Attorneys For PLAINTIFF CHRISTOPHER SOLLMAN

### JURY DEMAND

Plaintiff demands trial by jury in this action


Dated this 6th day of July 2026

/s/ Beth A. Huber, SBN 1120263

Huber Law Firm LLC
*Attorney for Plaintiff*
*Christopher Sollman*

MAILING ADDRESS:
N2311 County Road DJ
Watertown, WI 53098
Cell: (415) 497 9173
Fax: (920) 542-6090
Email: bhuber@huberlawfirm.net